## Case No. 4,430.

ELY et al. v. HANKS.

[1 West. Law Month. 107.]

District Court, N. D. Ohio. Sept. Term, 1858.

---

[1] [Reprinted from 14 Reporter, 513, by permission.]

Spaulding & Parsons, for plaintiffs.
Mason & Estep, for defendant.

WILLSON, District Judge. This is a motion made by the defendant, to dismiss an attachment. The suit was commenced and the order of attachment allowed under the provisions of the 25th rule of this court. Both the summons and the writ of attachment issued on the 2d day of December, 1857. The cause of action, as endorsed upon the writ, is set forth to be three promissory notes of the defendant, dated September 23d, 1857, for $1,184.50 each, payable, respectively, in four, six and eight months from the date of their execution.

The grounds for dismissing the attachment, as detailed in the motion, are: 1. That the affidavit is insufficient, in this: that it nowhere avers positively that said Hanks had disposed of, or was about to dispose of; or to remove his property with the fraudulent intent to cheat, or hinder and delay his creditors; but states only the belief of the affiant, that such is the fact. 2. That the affidavit shows, that the real estate mentioned therein, was sold before the said debt of the defendant was contracted; and, 3. That said affidavit is defective, and does not state facts sufficient, upon which to allow an attachment before the maturity of a debt.

The main point discussed by counsel, in the argument, is not embraced in the written motion. It is a point, however, which involves a grave question, inasmuch as it goes directly to the power of this court to adopt, by rule of practice, the provisions of the statute law of Ohio, regulating proceedings in attachment. It is insisted that the circuit court of the United States has no power or authority to order the writ, in a case where no right of action has accrued at common law, upon a debt against the defendant. In the case at bar, the record shows an ac-

tion brought on notes not due. The right of thus bringing suit is claimed by virtue of the 25th rule of this court, which rule declares "that attachments may issue for the same cause and like proceedings may be had thereon (so far as the same may be applicable) as is prescribed in chapter 3 of the Code of Civil Procedure of the state of Ohio," &c. This rule has been adopted in conformity to the acts of congress of May 19, 1828, and March 14, 1848. The first section of the law of 1828 provides "that the forms of mesne process, (except the style,) and the forms and modes of proceeding in suits in the courts of the United States, held in those states admitted into the Union since the 29th day of September, 1789, in those of common law, shall be the same in each of those states respectively, as are now used in the highest court of original and general jurisdiction of the same, subject however to such alterations and additions as the said courts of the United States respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper, from time to time, by rules, to prescribe to any circuit or district court concerning the same." By the act of 1848 it is provided—"that whenever, upon process instituted in any of the courts of the United States, property shall hereafter be attached, to satisfy any such judgment as may be recovered by the plaintiff in such process, and any contingency occurs, by which, according to the laws of a state, attachment would be dissolved upon like process pending in or returnable to the state courts, then such attachment or attachments made upon process issuing from or pending in any of the courts of the United States within such state, shall be dissolved;—the intent and meaning of this act being to place such attachments in the courts of the states and the United States upon the same footing."

That the circuit courts have power to prescribe, and regulate, by rules, the mode of proceeding and practice, in all common law actions which come before them, (unless in cases specially provided for by act of congress, or the rules of the supreme court) cannot be seriously questioned, or admit of any argument. This power, in new states, is conferred by the act of congress of 1828, and its exercise is indispensable to the proper administration of justice by those courts. Nor can the words "forms and modes of proceeding" used in the act of 1828 be misapprehended in their just interpretation and import. And if they were susceptible of doubtful meaning, any such uncertainty is removed by the construction given to the precise language of the act, by the supreme court of the United States in Wayman v. Southard, 10 Wheat. [23 U. S.] 1. Chief Justice Marshall, in construing the process act of 1789, in that case says: "To the forms of writs and executions, the law adds the

words, 'and modes of process.' These words must have been intended to comprehend something more than the 'forms of writs and executions.' We have not a right to consider them as mere tautology. They have a meaning and ought to be allowed an operation more extended than the preceding words. The term is applicable to every step taken in the cause. It indicates the progressive course of the business from its commencement to its termination; and 'modes of process' may be considered as equivalent to modes or manner of proceeding." This construction is supported by the succeeding sentence, which is in these words: "And the forms and modes of proceedings, in causes of equity, and of admiralty and maritime jurisdiction, shall be according to the course of the civil law." The preceding sentence had adopted the forms of writs and executions, and the modes of process then existing in the courts of the states, as a rule for the federal courts in suits at common law. And this sentence adopts the forms and modes of proceeding of civil law, in cases of equity and maritime jurisdiction.

"It has not been doubted," (says the chief justice,) "that this sentence was intended to regulate the whole course of proceeding in causes of equity and admiralty and maritime jurisdiction. It would be difficult to assign a reason for the solicitude of congress to regulate all the proceedings of the court, sitting as a court of equity or of admiralty, which would not equally require that its proceedings should be regulated when sitting as a court of common law. The two subjects were equally within the province of the legislature, equally demanded their attention, and were brought together, to their view. If, then, the words making provision for each, fairly admit of an equally extensive interpretation, and of one which will effect the object that seems to have been in contemplation, and which was certainly desirable, they ought to receive that interpretation. 'The forms of writs and executions and modes of process in suits at common law,' and 'the forms and modes of proceeding in cases of equity, and of admiralty and maritime jurisdiction,' embrace the same subject, and both relate to the progress of the suit from its commencement to its close." We give this exposition of the intent and meaning of the language used in the process act of 1789, in order to arrive at a more satisfactory conclusion as to the scope and purposes of the terms employed in the act of 1828. Doubts had arisen in relation to the import of the words "modes of process," as used in the law of 1789, and those doubts had rendered it necessary for the supreme court to give them a judicial interpretation. Congress, in enacting the law of 1828, obviated this difficulty by the use of words of obvious and unequivocal meaning. The phrase "modes of process" was abandoned, and that of "the forms of mesne process and the forms and modes of proceeding" was substituted, thereby placing beyond controversy the whole question of the power of the court in adopting rules of practice in common law actions.

But it is urged, that the provisions of the Ohio code, authorizing the commencement of a suit, and the issuing of a writ of attachment, upon a debt not due, being proceedings in derogation of the common law, cannot be incorporated into the rules of practice of the federal courts. This position of counsel would be well taken, if such proceeding interfered with, or in any way affected, the law of contract. But such is not the effect. They simply go to the law of the remedy. No judgment can be obtained till the debt is due, and no application of the money, secured by the process of attachment, can be made in satisfaction of the debt until after the rendition of the judgment. The whole purpose and the only purpose of these remedial proceedings is to protect the creditor against the frauds of a dishonest debtor, which purpose is alike commendable in morals and salutary in practice.

It is true, that by the 25th rule, a practice is adopted, variant from the usages known to the common law. This, however, is not an infallible test, either of the propriety of the rule, or of the power and authority in the court to adopt it. The supreme court of the United States has repeatedly sanctioned the adoption by the federal courts, of rules of state practice which were unknown to the common law. Mills v. Bank of U. S., 11 Wheat. [24 U. S.] 431, was a case in which the circuit court adopted a rule of state practice, dispensing with proof of the execution of a note, unless the party annexed to his plea an affidavit that the note was not executed by him. In Fullerton v. Bank of U. S., 1 Pet. [26 U. S.] 604, it was decided that there was nothing in the constitution or laws of the United States, to prevent the circuit from adopting, as a rule of practice, the legislative act of the state of Ohio concerning actions against drawers and endorsers of commercial paper. These rules of the circuit court were certainly in derogation of the common law, but the practice inaugurated by them was sanctioned and approved by the highest judicial tribunal of the country. But the law of the 14th of March, 1848, leaves no latitude for the exercise of discretion by this court in the framing of rules regulating attachment proceedings. It expressly declares, that the true intent and meaning of congress was, "to place such attachments in the courts of the states and the United States upon the same footing." This law is not only free from doubt and uncertainty as to the intention of the legislature, but it has also its foundation in reason and justice. It furnishes a rule of practice, alike available to the citizens of the different states, whether they seek justice and prosecute their actions, in the federal or state courts of Ohio, and the 25th rule, which was adopted in con-

formity to this act of congress, provides a security for the foreign creditor, by operation of law, equal to that provided for the domestic creditor, whenever the debtor, by fraudulent practices, has placed the debt in jeopardy. Hence we declare, that not only was this rule demanded by the requirements of the act of 1848, but also, that it is entitled to the liberal and enlarged construction which we have given it. Besides, by adopting the provisions of the Ohio code in relation to attachments, the court did no more than simply carry out that injunction of the judiciary act of 1793 [1 Stat. 333], which requires the courts of the United States "to so regulate the practice thereof, as shall be fit and necessary for the advancement of justice, and especially, to that end, to prevent delays in proceedings."

This brings us to the consideration of the question raised, by the first, second, and third points made in the written motion; to wit, the insufficiency of the affidavit, on which the order for attachment was granted. In section 191 of the Ohio code (which is embraced in the 25th rule) it is provided that "the plaintiff in a civil action for the recovery of money, may, at or after the commencement thereof have an attachment against the property of the defendant, and (among other causes) upon the following grounds: "When the defendant has assigned, removed or disposed of his property, or a part thereof, with the intent to defraud his creditors; or that he fraudulently contracted the debt or incurred the obligation for which suit is about to be, or has been brought." In section 192, it is further provided that "an order of attachment shall be made, when the plaintiff, his agent or attorney shall make an oath, in writing, showing the nature and amount of the plaintiff's claim, that it is just, when it will become due, and the existence of some one" of the grounds enumerated in section 191 (Swan's St. 647). The affidavit in this case was made by the plaintiff's attorney. It is alleged in the affidavit, that said Hanks, in the latter part of September, 1857, was a citizen of Ohio, engaged in the mercantile business at Toledo, at which time he went to the city of New York to purchase goods. That while in said city he called on the plaintiffs, to whom he represented that he was worth $20,000, and requested them to sell him goods on a credit of four, six or eight months. The plaintiff, supposing from his representations, that he was possessed of a valuable real estate in the city of Toledo, and that he was fairly worth $20,000, sold him goods to the amount of $3,553.50, for which they took his three notes now in suit. That the defendant has, for several years last past, been a vendor of merchandise at Toledo, where he was seized of a valuable real estate, consisting of city lots on which was built a store and various dwelling houses.—That during the year 1857 he conveyed away said real estate, for a pretended pecuniary consideration, a portion of which was deeded to his three minor children, and a valuable dwelling house and two lots to a "sort of speculator" in New York by the name of Hunt. That early in November, 1857, the defendant sold his whole stock of dry goods, (which he had in store at Toledo,) to J. H. Butler, Jr., for about the sum of $7000, for which he took the notes of said Butler, payable in six, twelve, eighteen and twenty-four months, without any security whatever. That many of these goods were those purchased of the plaintiffs by the defendant in the preceding month of September. That, at the same time, the said Hanks sold his whole stock of groceries which he had for sale in his brick store in Toledo, (and which was separate and distinct from the store containing the dry goods,) to William Anderson & Samuel Scott, and took their promissory notes for about $3000, payable in eight, twelve, sixteen and twenty-four months without security. The affiant further states, that as the attorney of the plaintiff, he made personal application to the said Hanks on the 28th of November, 1857, for security, and proposed to take as collateral security an amount of notes (for which said goods had been sold) equal in amount to the notes held by the plaintiffs against said defendant; but was refused.

Upon this statement of facts, detailed by him, the affiant says he verily believes said sales were made by said Hanks with the intent, on his part, to place said property beyond the reach of an execution at law. To the sufficiency of this affidavit it is objected, that the attorney making it, does not swear positively to the fact of the fraudulent intent of the defendant. A man's intention can only be ascertained by facts and circumstances evinced by his conduct. None but the "Great Omniscient" can penetrate, know and declare the secret purposes of the heart. And he who undertakes to swear absolutely to the intention of another, must have faint conceptions, of not only the moral sanctity of an oath, but also of its nature and obligations. The statute requires the order of attachment to be made when "the plaintiff, his agent or attorney shall make oath, in writing, showing the existence of the fraudulent intentions of the defendant." How is this to be "shown?" Certainly, not by an independent arbitrary oath, simply declaring those intentions. That of itself would prove nothing. We must resort to the same kind of evidence as the law requires in other cases of like character. We look to what the defendant has said,—what he has done, and the circumstances attending his conduct in the particular transactions. Those facts and circumstances, when known, may warrant or may not justify the belief of fraudulent intentions. And it is by these tests only, that the sufficiency of this affidavit is to be determined.

It has been the practice of this court to grant an order of attachment, whenever, by affidavit filed, a prima facie case is made out against the defendant. That particularity as

to form and detail in an affidavit has not been exacted, which is required in an indictment charging crime. Neither has that fulness of proof, usually necessary to convict of crime, been deemed necessary. And the reason for acting upon prima facie evidence, is, that the party, against whose property the attachment issues, has the speedy remedy of moving for its dissolution and showing by ex parte affidavits, that the allegations of fraud made against him are untrue. How then stands this case? The defendant is charged with disposing of his property to third persons, with the intent to defraud his creditors. The proof is, that a short time before this debt was contracted, he disposed of all his real estate, and a large portion of it to his minor children. That immediately after the debt to the plaintiffs was created, he sold two entire stocks of goods, (including the goods purchased of the plaintiffs) upon a credit, varying from eight months to two years, taking no security for the same. Now, the conduct of a party may be just as obnoxious to the provisions of the statute, when he obtains a credit upon what he once had and has parted with, as by fraudulently disposing of his property after the credit is obtained. The fraud in such a case does not necessarily consist in disposing of the property, but in the dishonest mode of obtaining the credit. He fraudulently contracts the debt. But when a merchant buys goods on deferred payments of four, six and eight months, and immediately sells them on a credit of eight, twelve, sixteen and twenty-four months, and without security, and thereby divests himself of all property liable to seizure on execution, the sale, and in fact the whole transaction carries with it the most palpable badges of fraud. And this is the most common as well as the most effectual mode of defrauding eastern merchants; and one, when unexplained, that makes at least a prima facie case of fraud, and which merits no favor in a court of justice. The defendant has produced no proof, either denying or in explanation of the case made by the affidavit of the plaintiffs' attorney.

The motion to dismiss the attachment is overruled.